KENDRA PENNINGROTH (#18649)
**CONSUMER ATTORNEYS**
8245 North 85th Way
Scottsdale, AZ 85258
Telephone: (480) 626-1447
Fax: (718) 715-1750
Email: kpenningroth@consumerattorneys.com

*Attorneys for Plaintiff Allen Mauia*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ALLEN MAUIA,<br><br>　　　　　Plaintiff,<br>v.<br><br>EQUIFAX INFORMATION SERVICES, LLC,<br><br>　　　　　Defendant. | Case No.<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>FCRA, 15 U.S.C. § 1681 *et seq.* |

Plaintiff Allen Mauia ("Plaintiff" or "Mr. Mauia"), through counsel, alleges violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.* against Equifax Information Services, LLC ("Equifax" or Defendant), and states as follows:

## INTRODUCTION

1.　Plaintiff's Complaint arises from violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.* by Defendant. Plaintiff contends that Defendant violated 15 U.S.C. § 1681e(b) in failing to follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's consumer reports, which caused it to report the same two debts ***twice***.

1

2. In particular, Defendant reported that Plaintiff owed an outstanding and past due balance on each of two Mountain America Credit Union ("MACU") debts and two Knight debts, a total of four debts. In so doing, Defendant was conveying to third-party credit evaluators that Plaintiff had been delinquent on four distinct debts, and thus was a high credit risk.

3. In truth, the MACU debts and the Knight debts were one and the same: MACU had charged-off and transferred and/or sold Plaintiff's two MACU debts to Knight Adjustment Bureau ("Knight"), a debt collector, in 2020 and 2021.

4. The Defendant's double-reporting of the same outstanding debts misled and inaccurately conveyed to third parties that Plaintiff was delinquent on four separate debts, and that he owed a higher balance than he actually owed.

5. Plaintiff's Complaint also alleges that Defendant violated 15 U.S.C. § 1681i in failing to reasonably investigate Plaintiff's consumer dispute, which resulted in Defendant's continued reporting of the inaccurate information about Plaintiff.

## JURISDICTION AND VENUE

6. This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 because Plaintiff alleges violations of the FCRA, a federal law. *See* 15 U.S.C. § 1681p (FCRA) (permitting actions to enforce liability in an appropriate United States District Court).

7. Venue in this District is proper pursuant to 28 U.S.C. § 1391 because Defendant regularly transact business within this District or are otherwise subject to personal jurisdiction in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## PARTIES

8. Plaintiff is a natural person who resides in Saint George, Utah.

9. Plaintiff is a "consumer" as defined by the FCRA, 15 U.S.C. § 1681a(c).

10. Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

11. Equifax regularly engages in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing "consumer reports," as defined in 15 U.S.C. § 1681a(d), to third parties. Equifax regularly furnishes consumer reports to third parties for monetary compensation, fees, and other dues, using means and facilities of interstate commerce, and are therefore "consumer reporting agencies" as defined by 15 U.S.C. §1681a(f) of the FCRA.

12. During all times pertinent to this Complaint, Defendant acted through its authorized agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and/or insurers.

## FACTUAL BACKGROUND

13. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully set forth at length herein.

14. Enacted in 1970, the FCRA's passage was driven in part by two related concerns: first, that consumer reports were playing a central role in people's lives at crucial moments, such as when they applied for a job or credit, and when they applied for housing. Second, despite their importance, consumer reports were unregulated and had widespread errors and inaccuracies.

15. While recognizing that consumer reports play an important role in the economy, Congress wanted consumer reports to be "fair and equitable to the consumer" and to ensure "the

3

confidentiality, accuracy, relevancy, and proper utilization" of consumer reports. 15 U.S.C. § 1681.

16. Congress, concerned about inaccuracies in consumer reports, specifically required consumer reporting agencies to follow "reasonable procedures to assure maximum possible accuracy" in consumer reports. 15 U.S.C. § 1681e(b).

17. Consumer reports that contain factually incorrect information which does not belong to the consumer at issue are neither maximally accurate nor fair to the consumers who are the subjects of such reports.

18. The FCRA is intended to ensure consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy because consumer reporting agencies have assumed such a vital role in assembling and evaluating consumer credit and other consumer information.

19. Defendant Equifax, one of the three major consumer reporting agencies in the United States, regularly publishes and distributes credit information about Plaintiff and other consumers through the sale of consumer reports.

20. The Defendant's consumer reports generally contain the following information: (i) <u>Header/Identifying Information:</u> this section generally includes the consumer's name, current and prior addresses, date of birth, and phone numbers; (ii) <u>Tradeline Information</u>: this section pertains to consumer credit history, and includes the type of credit account, credit limit or loan amount, account balance, payment history, and status; (iii) <u>Public Record Information</u>: this section typically includes public record information, such as bankruptcy filings; and (iv) <u>Credit Inquiries</u>: this section lists every entity that has accessed the consumer's file through a "hard inquiry" (i.e., consumer-initiated activities, such as applications for credit cards, to rent an apartment, to open a

deposit account, or for other services) or "soft inquiry" (i.e., user-initiated inquiries like prescreening).

21.     The Defendant obtains consumer information from various sources. Some consumer information is sent directly to the CRAs by furnishers, and other information is independently gathered by CRAs from third party providers, vendors, or repositories, like computerized reporting services like PACER and Lexis-Nexis.

22.     The majority of institutions that offer financial services (e.g., banks, creditors, lenders) rely upon consumer reports from CRAs (like Defendant) to make lending decisions.

23.     Those institutions also use FICO Scores, and other proprietary third-party algorithms (or "scoring" models), including debt-to-income ratios, to interpret the information in a consumer's consumer report, which is based on the amount of reported debt, payment history, and date of delinquencies contained in the CRAs' consumer reports.

24.     The information Defendant includes in a consumer report contributes to a consumer's overall creditworthiness and determines their FICO Scores.

25.     FICO Scores are calculated using information contained in the Defendant's consumer reports.

26.     FICO and other third-party algorithms use variables or "attributes" derived from a consumer's consumer report to calculate a "credit score," which is a direct reflection of a consumer's creditworthiness.

27.     FICO Scores factor in the following consumer report information: Payment history (35%); Amount of debt (30%); Length of credit history (15%); New credit (10%); and Credit mix (10%).

    a)    "Payment history" refers to whether a consumer has paid his or her bills in the past, and whether these payments have been timely, late, or missed. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently the delinquency occurred, and how many delinquent accounts exist. The more severe, recent, and frequent late payments are, the lower a consumer's FICO Score will be.

    b)    The "amount of debt" a consumer owes has a major impact on their credit score. When a CRA reports a debt as outstanding when it is in fact discharged, the CRA indicates that a consumer's "amount of debt" is higher than it actually is, which will undoubtedly impact a consumer's credit score.

28. Lenders also consider a consumer's debt-to-income ratio (DTI) before deciding to extend credit or approve financing terms.

29. DTI compares the total amount a consumer owes to the total amount a consumer earns.

30. A consumer's income, however, is not included in their consumer report; only their amount of debt is.

31. The higher the amount of reported debt that a consumer has, or appears to have, the worse the consumer's DTI will be, and the more difficult it will be for a consumer to obtain credit and favorable credit terms (e.g., higher interest and lower credit limits).

**A.   Allegations Specific to Credit Reporting of Plaintiff**

32. Plaintiff resides in Saint George, Utah.

33. Some time ago, Plaintiff had opened a MACU credit line in or around September of 2019, and, due to financial circumstances, then missed several monthly payments.

34. In or around January 2021, the MACU credit card debt, in the amount of $766 dollars (referred to herein as the "MACU Credit Debt"), was charged-off, and was eventually sold to Knight, a debt collector.

35. In addition, Plaintiff had obtained a MACU auto loan in or around September of 2019, and, due to financial circumstances, then missed several monthly payments.

36. In or around October 2020, the MACU auto loan debt, in the amount of $4,339 dollars (referred to herein as the "MACU Auto Debt"), was charged-off, and was eventually also sold to Knight, a debt collector.

37. In mid-2021, Plaintiff had been exploring purchasing a new home and obtaining a mortgage loan, and he recognized that a stronger credit profile and higher credit score was essential to securing a mortgage loan at necessary dollar amounts and at more favorable interest rates.

38. Therefore, in mid-2021, Plaintiff began working to bolster his credit profile and thereby improve his credit score and credit prospects.

39. However, Plaintiff noticed that his applications for even basic credit cards would either be denied or be granted at higher interest rates and at substantially reduced credit limits.

40. On or about April 3, 2022, Plaintiff submitted an application to Capital One to open a line of credit and obtain a credit card.

41. By letter dated April 4, 2022, Capital One denied Plaintiff's application for a credit card.

42. In evaluating Plaintiff's application for a credit card, Capital One had obtained a consumer report from each of Trans Union, Equifax, and Experian.

43. Plaintiff was surprised by the credit denial, and was resolved to better understand his credit profile, determine why his credit application was denied, and to correct any unfair or inaccurate reporting that may have been causing his credit issues.

44. In so doing, Plaintiff obtained a copy of a consumer report from each of Trans Union, Equifax, and Experian.

45. Upon review of such consumer reports, Plaintiff was shocked and utterly dismayed to notice that each was reporting the same two debts twice, and making it appear as if Plaintiff was a far greater credit risk than he actually was.

46. In particular, with respect to Equifax, Plaintiff noticed that Equifax's credit report included both the MACU Credit Debt and the MACU Auto Debt (both together, the "MACU Debts") as MACU tradelines, and indicated in each such tradeline a current and outstanding "[b]alance" owing of $766 dollars and $4,339 dollars, respectively.

47. Further, Equifax's credit report indicated in each of the MACU Credit Debt tradeline and the MACU Auto Debt tradeline a "[p]ast due amount" of $766 dollars and $4,339 dollars, respectively.

48. In addition to the MACU Debts, the Equifax credit report indicated an active and open Knight collection account tradeline that arose from and corresponded to each of the MACU Debts, with such Knight tradelines indicating an owed "[b]alance" of $767 dollars for the MACU Credit Debt and $4,339 for the MACU Auto Debt.

49. Put simply, Equifax was double-reporting the MACU Debts: it reported the MACU Debts in the MACU tradelines as owing outstanding balances and past-due balances; and it additionally reported the MACU Debts in the Knight collection accounts tradelines, again as owing outstanding balances.

50. Upon information and belief, Equifax's credit report reflected that Equifax was double-reporting even its double-reporting: Equifax's credit report included the MACU Debts and the Knight collection account tradelines, and additionally reported another two Kight collections tradelines that corresponded to the same MACU Debts but this time under a section that purported to report on "Collection accounts."

51. Stated otherwise, upon information and belief, Equifax's credit reports reflected that Equifax was reporting the same two MACU debts as constituting six (6) separate tradelines.

52. Upon information and belief, a reasonable third-party evaluator of Plaintiff's credit worthiness who reviewed Equifax's consumer report would have been misled into believing that Plaintiff owed $4,339 three times, in addition approximately $766 three times.

53. Thus, such third-party evaluator of Plaintiff's credit worthiness would have mistakenly believed that Plaintiff DTI was higher than it truly was.

54. Further, upon information and belief, a reasonable third-party evaluator of Plaintiff's credit worthiness who reviewed Equifax's consumer report would have been misled into believing that Plaintiff was the subject of four, or six, separate and distinct credit delinquencies, instead of just two such delinquencies.

55. Worse yet, upon information and belief, credit evaluating algorithms, such as those that produce the FICO Score and other credit scores, which consider the information in Plaintiff's Equifax's credit file or consumer report, would be misled into erroneously calculating a lower credit score based on such Defendant's double or triple-reporting the MACU Debts.

56. Capital One's denial of Plaintiff's application for a credit card was based on a consumer report from Equifax, which contained the inaccurate double-reporting or triple-reporting of the MACU Debts.

57. On or about May 5, 2022, Plaintiff mailed a written dispute letter to Equifax (the "May Dispute").

58. The May Dispute made clear to Equifax that it was double-reporting the same debt, which was inaccurate and is harmful to Plaintiff and Plaintiff's credit.

59. On or about July 11, 2022, Plaintiff again reviewed a copy of a Equifax consumer report.

60. To Plaintiff dismay and distress, Equifax' consumer report was still double-reporting the MACU Debts on both the MACU and Knight tradelines in the manner described *supra*, and which report reflected that Equifax was still including the double-reporting of the MACU Debts in its consumer file and consumer reports.

61. That is, despite receiving Plaintiff's dispute, Equifax failed to correct its reporting or remove its inaccurate double-reporting or triple-reporting of the MACU Debts.

62. Because of Equifax's double-reporting of the MACU Debts, Plaintiff encountered significant difficulty and hardship in building his credit score, which he had wanted to do in order to better qualify for credit opportunities generally, but a mortgage loan in particular.

63. At one point, Plaintiff discussed his prospects of obtaining a mortgage loan with a local mortgage broker, which broker – after reviewing a copy of Plaintiff's consumer report – informed Plaintiff that would not qualify for suitable mortgage loans based on his credit score and credit standing, and, specifically, the existence of the double-reporting of the MACU Debts.

64. In or around March 28, 2023, Plaintiff submitted another dispute to Equifax concerning the MACU Debts that disputed the inaccurate and harmful double-reporting of the MACU Debts.

65. In response to Plaintiff's March 2023 dispute, Equifax finally removed its double-reporting of the MACU Debts.

66. During the months between May 2022 and March 2023, Plaintiff reviewed copies of his Equifax credit reports on numerous occasions.

67. Each time Plaintiff reviewed a copy of such credit report produced by Equifax that still contained the inaccurate and highly misleading double-reporting of the MACU Debts, Plaintiff felt extremely shocked, surprised, and embarrassed at Equifax's inaccurate reporting and utter failure to adequately and accurately maintain his credit information.

**B.  Defendant's Method for Considering Consumer Report Disputes**

68. The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. *See* 15 U.S.C. § 1681i(a)(5)(D).

69. The credit bureaus, Equifax, Experian, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

70. That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro II."

71. It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

72. Metro II is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued

11

to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

73. Metro II codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

74. The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

75. These ACDV "fields" have various titles for the many substantive areas into which the Metro II codes can be entered.

76. Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

77. The data furnishers, like MACU and Knight, then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. See 15 U.S.C. § 1681s-2(b).

78. Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via e-OSCAR.

79. Upon information and belief and as required by federal statute, each time Plaintiff submitted a dispute of the MACU Debts double-reporting to Equifax, Equifax forwarded that dispute to MACU.

## C.   Defendant Caused Additional Injury to Plaintiff

80.   As a standard practice, each of the Defendant does not conduct independent investigations in response to consumer disputes. Instead, they merely parrot the response of the credit furnisher, like MACU here, despite numerous court decisions admonishing this practice. *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by § 1681(a) must consist of something more than merely parroting information received from other sources. Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

81.   Defendant is aware of the shortcomings of its procedures and intentionally chooses not to comply with the FCRA to lower its costs. Accordingly, Defendant's violations of the FCRA are willful.

82.   As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his accurate and more positive credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

83. In response to Plaintiff's May Dispute to Equifax, Equifax failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

84. Defendant violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

85. Defendant's conduct, actions, and inactions were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

86. Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## CAUSES OF ACTION

### COUNT I
### Violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681e(b)

87. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully set forth herein at length.

88. The FCRA requires CRAs, like Defendant, to maintain and follow reasonable procedures to assure maximum possible accuracy of consumer information. 15 U.S.C. § 1681e(b).

89. In this case, Defendant negligently and willfully violated 15 U.S.C. § 1681e(b) by failing to use reasonable procedures to assure maximum possible accuracy of Plaintiff's credit information.

90. Defendant independently sought information about Plaintiff's consumer credit information and voluntarily reported it in Plaintiff's consumer reports.

91. When the Defendant procured and published Plaintiff's consumer credit information, it had an obligation to ensure they followed reasonable procedures to report the information with maximal accuracy.

92. Defendant knows that debts and credit balances are often charged-off and transferred or sold to other entities or debt collectors. Thus, they should have established systems for detecting the occurrences of double-reporting and ensuring that their reporting is not inaccurate or highly misleading, which they failed to do.

93. Defendant violated 15 U.S.C. § 1681e(b) by failing to follow reasonable procedures to assure maximum possible accuracy of the information included in Plaintiff's credit file and consumer reports, and by also failing to report accurate information when it knew or should have known the information they were reporting is inaccurate, or otherwise contradicted by information known by Defendant, reported to Defendant, or reasonably available to Defendant.

94. Defendant therefore further failed to follow reasonable procedures, as 15 U.S.C. § 1681e(b) requires, by unreasonably relying on the furnisher, where, as here, Defendant possessed sufficient notice of errors in Plaintiff's report to require a thorough review of the MACU Debts being reported.

95. Defendant's violations of 15 U.S.C. § 1681e(b) were willful. Defendant willfully chose to ignore the obvious double-reporting in Plaintiff's report, and willfully chose to ignore Plaintiff's dispute in favor of simply parroting the reporting of MACU and Knight.

96. Alternatively, Defendant's violations of 15 U.S.C. § 1681e(b) were negligent.

97. Defendant's inaccurate reporting damaged Plaintiff's creditworthiness.

98. Plaintiff suffers actual damages, including a decreased credit score, harm to his reputation, loss of credit opportunities, and other financial harm caused by Defendant inaccurately reporting the Account.

99. Plaintiff also suffers interference with daily activities caused by other harm including, but not limited to, emotional distress, mental anguish, humiliation, stress, anger, frustration, shock, embarrassment, loss of sleep, and anxiety.

100. Defendant is a direct and proximate cause of Plaintiff's damages.

101. Defendant is a substantial factors in Plaintiff's damages.

102. Defendant's acts, as described above, were done willfully and knowingly; or, alternatively, were committed negligently.

103. Therefore, Defendant is individually liable for actual and statutory damages, punitive damages, attorneys' fees, costs, as well as other such relief permitted by 15 U.S.C. § 1681 *et seq*.

## COUNT II
### Violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681i

104. When a consumer disputes the accuracy or completion of information included in a CRA's credit file, the FCRA requires the agency to either conduct a reasonable reinvestigation into the disputed information **or** delete the disputed information from the consumer's credit file within thirty (30) days of receiving notice of the dispute. 15 U.S.C. § 1681i(a)(2)(A).

16

105. When conducting its reinvestigation of disputed information in a consumer report, the consumer reporting agency is required to "review and consider all relevant information submitted by the consumer."

106. Additionally, the CRA must notify the person who furnished the disputed information of the consumer's dispute within five business days of its receipt. When notifying the furnisher of the consumer's dispute, the CRA is to "include all relevant information regarding the dispute that the agency received from the consumer." 15 U.S.C. § 1681i(a)(2)(A).

107. When a CRA receives a dispute pursuant to § 1681i, and conducts the reinvestigation, the CRA is required to "provide written notice" to that consumer of the results of the reinvestigation "not later than 5 business days after the completion of the reinvestigation." 15 U.S.C. § 1681i(a)(6)(A).

108. Thus, in addition to violating the FCRA by failing to follow reasonable procedures as 15 U.S.C. § 1681e(b) requires, Defendant also violated the FCRA by failing to perform a reasonable reinvestigation of the disputed MACU Debts even after Plaintiff notified each of the Defendant of the inaccurate information in Plaintiff's credit file.

109. Defendant's violation of 15 U.S.C. § 1681i includes, but is not limited to, the following:

  a) Failing to reasonably reinvestigate the inaccurate information Plaintiff disputed.

  b) Failing to consider all relevant information while investigating Plaintiff's dispute.

  c) Failing to include all relevant information when notifying MACU and Knight of Plaintiff's dispute.

110. Instead of reasonably reinvestigating Plaintiff's dispute, Defendant merely parroted MACU and Knight's reporting, and "verified" the reporting as accurate.

111. Defendant's inaccurate reporting damaged Plaintiff's creditworthiness.

112. Plaintiff suffers actual damages, including a decreased credit score, harm to his reputation, loss of credit opportunities, and other financial harm caused by Defendant's inaccurately reporting the MACU Debts.

113. Plaintiff also suffers interference with daily activities caused by other harm including, but not limited to, emotional distress, mental anguish, humiliation, stress, anger, frustration, shock, embarrassment, and anxiety.

114. Defendant is a direct and proximate cause of Plaintiff's damages.

115. Defendant is a substantial factor in Plaintiff's damages.

116. Defendant's acts, as described above, were done willfully and knowingly; or, alternatively, were committed negligently.

117. Therefore, Defendant is individually liable for actual and statutory damages, punitive damages, attorneys' fees, costs, as well as other such relief permitted by 15 U.S.C. § 1681 *et seq*.

## JURY DEMAND

118. Plaintiff hereby demands jury trial on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court enter judgments against Defendant for the following:

a) Declaratory judgment that Defendant violated the FCRA, 15 U.S.C. § 1681e(b) and § 1681i;

b)     An award of actual damages pursuant to 15 U.S.C. §§ 1681n(a)(1) or 1681o(a)(1);

c)     An award of statutory damages pursuant to 15 U.S.C. §§ 1681n(a)(1) and 1681o(a)(1);

d)     An award of punitive damages, as allowed by the Court pursuant to 15 U.S.C. § 1681n(a)(2),

e)     Costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1681n(a)(3) and § 1681o(a)(2); and

f)     Such other and further relief as this Honorable Court may deem just and proper, including any applicable pre-judgment and post-judgment interest, and/or declaratory relief.

Dated: November 6, 2023,           Respectfully submitted,

*/s/ Kendra Penningroth*
KENDRA PENNINGROTH (#18649)
**CONSUMER ATTORNEYS**
8245 North 85th Way
Scottsdale, AZ 85258
Telephone: (480) 626-1447
Fax: (718) 715-1750
Email: kpenningroth@consumerattorneys.com

*Attorneys for Plaintiff Allen Mauia*